UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


LAURENCE JOSEPH MCDONALD,   )   CASE NO. 1:16CV217
   )
   Plaintiff,   )   JUDGE JAMES S. GWIN
   )
   v.   )   Magistrate Judge George J. Limbert
   )
CAROLYN W. COLVIN[1],   )
ACTING COMMISSIONER OF SOCIAL   )   REPORT AND RECOMMENDATION
SECURITY ADMINISTRATION,   )   OF MAGISTRATE JUDGE
   )
   Defendant.   )


Plaintiff Laurence Joseph McDonald ("Plaintiff") requests judicial review of the final decision of the Commissioner of the Social Security Administration ("Defendant") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1.  Plaintiff asserts that substantial evidence does not support the administrative law judge's ("ALJ") decision finding that his impairments do not meet or equal Listing 1.02 ("Listing 1.02") of 20 C.F.R. § 404, Subpart P, Appendix 1 ("The Listings") and the ALJ failed to properly apply the treating physician rule to the opinions of his treating physicians, Drs. Figg and Ogden. ECF Dkt. #11.

For the following reasons, the undersigned RECOMMENDS that the Court REVERSE the ALJ's decision and REMAND the instant case to the ALJ:

I.   **PROCEDURAL HISTORY**

On November 15, 2012, Plaintiff filed applications for DIB and SSI alleging disability beginning January 1, 2010 due to right and left shoulder and neck injuries, left knee problems, asthma, and thyroid removal.  ECF Dkt. #9 ("Tr.") at 198-204, 225.[2]  The Social Security

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2]All citations to the Transcript refer to the page numbers assigned when the transcript was filed in the CM/ECF system rather than the page numbers assigned when the transcript was compiled.  This allows the Court to easily reference the Transcript as the page numbers of the .PDF file containing the transcript

Administration ("SSA") denied Plaintiff's applications initially and upon reconsideration.  *Id.* at 131-138, 141-155.  Plaintiff then requested a hearing before an ALJ, and his hearing was held on February 11, 2015.  *Id.* at 33-64, 156.

On March 16, 2015, the ALJ issued a decision denying Plaintiff's applications for DIB and SSI.  Tr. at 14-24.  On January 28, 2016, Plaintiff filed the instant suit seeking review of the ALJ's decision in the United States District Court for the Southern District of Ohio.  ECF Dkt. #1.  On January 29, 2016, Plaintiff's case was transferred to this District.  ECF Dkt. #2.  Plaintiff filed a merits brief on May 2, 2016 and Defendant filed a merits brief on August 1, 2016.  ECF Dkt. #s 11, 14.

## II.    RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE

### A.    MEDICAL EVIDENCE

Plaintiff was injured in 2003 after the go-cart he was riding in crashed into a wall.  Tr. at 40, 301, 336.  He was hospitalized from July 6, 2003 through July 12, 2003 and sustained numerous fractures, including a right scapular fracture extending into the glenoid fossa and the articular surface, as well as into the base of the coracoid, a left scapular fracture extending into the acromion process and spanning the whole blade of the scapula up to the region of the apex, a comminuted fracture of the left humeral head, a nondisplaced fracture of the left lower posterior ribcage, and a right-sided moderate to large pneumothorax.  *Id*. at 308, 314-317, 320, 322, 334, 336.

According to Plaintiff, he underwent between 15 and 20 surgeries.  ECF Dkt. #11 at 3. Twelve surgeries are documented in the medical records before the Court.  These surgeries include: a February 13, 2009 right revision arthroscopic rotator cuff repair and right arthroscopic subacromial decompression (Tr. at 581); a July 13, 2010 left diagnostic arthroscopy, left arthroscopic abrasion plasty of the medial femoral condyle and chondroplasty of the patella (Tr. at 561); a December 30, 2010 left arthroscopic subacromial decompression, distal clavicle resection, extensive debridement and left elbow injection (Tr. at 558); a February 4, 2012 right

_____

correspond to the page numbers assigned when the transcript was filed in the CM/ECI system.

shoulder arthroscopic debridement and right shoulder arthroscopic superior angle ostectomy (Tr. at 785); a March 1, 2012 right forearm peripheral nerve decompression and radial tunnel release (Tr. at 781); a June 20, 2012 radiofrequency ablation at C3, C4, C5 and C6 on the right side (Tr. at 851); an August 3, 2012 C5-C6 anterior cervical diskectomy, fixation and fusion (Tr. at 959); an October 29, 2012 right shoulder arthroscopic posterior labral repair, right shoulder arthroscopic debridement of labrum fraying and cartilage fraying and right shoulder open biceps groove debridement and tonosynovectomy (Tr. at 665, 810); a January 18, 2013 left ulnar nerve release (Tr. at 889); January 31, 2013 drainage of left ulnar wound (Tr. at 892-897); a May 10, 2013 C4 to C7 posterior cervical fixation and fusion with Lanx lateral mass screw system; bilateral posterior cervical foraminotomies at C4-C5, C5-C6 and C6-C7; posterior arthrodesis (Tr. at 971-987); and a July 8, 2013 left carpal tunnel release (Tr. at 1002).

Plaintiff's assertions of error concern the ALJ's treatment of the medical reports of Dr. Figg, Plaintiff's treating physician who specializes in neurology and pain management, and Dr. Ogden, Plaintiff's treating neurologist and surgeon. ECF Dkt. #11 at 5-7. Plaintiff also challenges the ALJ's treatment of the opinion of his physical therapist, Phillip Stahr. *Id*. at 7. The undersigned will review the relevant medical reports and records of these providers in more detail in analyzing Plaintiff's assertions of error. The medical evidence in the record concerning each physician and Mr. Stahr will be reviewed here.

### B.      DR. OGDEN'S MEDICAL REPORTS AND RECORDS

Plaintiff first treated with Dr. Ogden in 2009 for his neck and right upper extremity pain. Tr. at 870. Dr. Ogden indicated that the cervical MRI and cervical flexion extension film showed mild foraminal stenosis on the right at C4-C5 and C5-C6. *Id.* Physical examination showed normal upper and lower extremity strength and normal reflexes except an absent right brachioradialis reflex. *Id.* He recommended an EMG/nerve conduction study and physical therapy with traction of the cervical spine. *Id.* He indicated no need for a follow-up with him unless physical therapy did not help. *Id.*

In a March 22, 2012 "[t]o whom it may concern" letter, Dr. Ogden reported that he saw Plaintiff after previously seeing him in May of 2009. Tr. at 831. Dr. Ogden examined Plaintiff's

imaging and EMG/nerve conduction study results and he diagnosed neck pain and bilateral upper extremity pain and numbness, mild right-sided foraminal narrowing at C4-C5 and C5-C6, and mild acute left C5 or C6 radiculopathy.  *Id*. at 831-844.  He recommended that Plaintiff undergo epidural steroid injections and referred him for a home cervical traction unit*. Id.* at 831.

On April 18, 2012, Mr. Stahr, a physical therapist,  performed an initial evaluation of Plaintiff for physical therapy.  Tr. at 1459.  He noted Plaintiff's surgical history and indicated that Plaintiff was referred to him for a home traction unit for neck pain and radiculopathy, and treatment for his cervical spine with upper extremity weakness and history of trauma to his shoulder with multiple surgeries.  *Id.* He listed Plaintiff's occupation as going to school full-time and the father of three sons.  *Id.*

In a July 18, 2012 "[t]o whom it may concern" letter, Dr. Ogden indicated that Plaintiff received three epidural steroid injections in the cervical spine and radiofrequency ablation on the right.  Tr. at 828.  A cervical MRI showed mild foraminal narrowing, and a cervical flexion and extension film with oblique views showed a 2mm of anterolisthesis at C5-C6 with an anterior osteophyte and the mild foraminal narrowing.  *Id*.  On the basis of these studies and the failure of conservative measures, Dr. Ogden recommended a C5-C6 anterior cervical discectomy, fixation and fusion.  *Id.*

A "[t]o whom it may concern" letter from Dr. Ogden dated September 5, 2012 showed that Plaintiff presented for his first post-operative follow-up from surgery and reported that he thought that his arm pain and numbness were gone.  Tr. at 826.  Plaintiff indicated that he nearly fell and held his arm out to catch himself and had some left-sided posterior neck pain since that time.  *Id*. X-rays showed no complication with the hardware in the cervical spine and Plaintiff had normal arm strength.  *Id*.  Dr. Ogden gave Plaintiff a steroid taper and Ambien for insomnia.  *Id*.

Dr. Ogden's November 14, 2012 "[t]o whom it may concern" letter indicated that Plaintiff presented for follow-up from his surgery and had undergone two courses of steroids for his severe left posterior neck pain and numbness in his left hand.  Tr. at 825.  X-rays showed no complications from the hardware placed in the cervical spine and Plaintiff had normal arm

strength. *Id.* Dr. Ogden noted that Plaintiff continued to perform physical therapy and massage, but found no relief. *Id.* He ordered a cervical MRI and a left upper extremity EMG/nerve conduction study. *Id.*

Dr. Ogden's December 12, 2012 "[t]o whom it may concern" letter indicated that Plaintiff presented for his third post-operative follow-up appointment and described left-sided neck pain and the return of numbness in his left hand, as well as pain in his right biceps. Tr. at 823. Dr. Ogden indicated that Plaintiff's cervical MRI showed no complications, although a small disc osteophyte complex was noted on the right at C4-C5 which gave mild foraminal narrowing. *Id.* Normal arm strength was indicated and a left upper extremity EMG/nerve conduction study showed left cubital tunnel syndrom and mild left carpal tunnel syndrome and evidence of acute left C5 and/or C6 radiculopathy. *Id.* Dr. Ogden indicated that he did not understand the radiculopathy results since he saw nothing to account for this in the cervical MRI. *Id.* He ordered a right upper extremity EMG/nerve conduction study and scheduled a left ulnar release surgery. *Id.*

On January 18, 2013, Dr. Ogden performed a left ulnar release. Tr. at 889. Plaintiff thereafter developed a post-operative wound infection of his elbow, which was treated at the hospital on January 27, 2013 through January 29, 2013. *Id.* at 892-931.

On January 22, 2013, x-rays ordered by Dr. Ogden of Plaintiff's neck showed the prior cervical decompression and fusion with hardware fixation at C5-C6 and an unstable grade 1 spondylolisthesis of C6 relative to C7, between flexion and extension. Tr. at 891.

On March 20, 2013, Dr. Ogden wrote Dr. Figg a letter indicating that he saw Plaintiff postoperatively since his left ulnar nerve release at the elbow and he informed Dr. Figg that Plaintiff continued to have pain in his right trapezius and in both arms and Plaintiff was being seen by an orthopedic surgeon concerning his left shoulder. Tr. at 959. He noted diagnoses of status post left ulnar release on January 18, 2013 with a postoperative infection which was being treated, status post C5-C6 anterior cervical discectomy, fixation and fusion with a nice surgical result, instability at C6-C7 on recent cervical flexion and extension films, and right and left C5 or C6 radiculopathy per recent EMG report. *Id.* He recommended a C4 to C7 posterior cervical fixation and fusion with bilateral foraminotomies at C4-C5, C5-C6 and C6-C7. *Id.* at 960.

On May 10, 2013, Dr. Ogden performed a C4-C7 posterior cervical fixation and fusion with a Lanx lateral mass screw system, bilateral foraminotomies at C4-C5, C5-C6 and C6-C7, and posterior arthrodesis.  Tr. at 971-975.  Plaintiff was hospitalized from May 10, 2013 through May 13, 2013.  *Id.*

On May 15, 2013, Plaintiff presented to the emergency room, explaining that he spoke to Dr. Ogden who told Plaintiff to be admitted to the hospital for pain management of his neck.  Tr. at 976.  The emergency room doctor spoke to Dr. Ogden by phone and Dr. Ogden recommended MS Contin, so the emergency room doctor prescribed MS Contin of 15 mg twice a day for 14 days for postoperative pain after discharging Plaintiff on May 16, 2013.  *Id.* at 976-986.

Plaintiff thereafter presented to the emergency room on June 4, 2013 complaining of left-sided neck pain after turning his head while lifting a gallon of milk.  Tr. at 987.  It was noted that Plaintiff had a pain specialist and he had been started on a Fentanyl patch and Percocet 10 mg tablets.  *Id*.  He was to see Dr. Ogden on June 5, 2013.  *Id.*  Physical examination showed tenderness in the left posterior neck and x-rays were ordered, which showed no acute abnormality.  *Id*. at 988-989.  He was given 2 mg of Dilaudid, diagnosed with postoperative neck pain, and released.  *Id.* at 989.

On June 11, 2013, Dr. Ogden wrote Dr. Figg a letter indicating that he saw Plaintiff for follow-up since his cervical fusion and his postoperative course was complicated by a return to the emergency room for pain management.  Tr. at 1000.  Plaintiff complained of a little numbness in his left hand.  *Id*.  X-rays showed no complication with the cervical hardware as the screws at C4, C5, C6 and C7 were in good position.  *Id.*  Dr. Ogden noted that Plaintiff wished to proceed with carpal tunnel release when able.  *Id*.

On July 8, 2013, Dr. Ogden performed a left carpal tunnel release for Plaintiff's left carpal tunnel syndrome.  Tr. at 1002-1007.  On July 31, 2013, Dr. Ogden wrote Dr. Figg a letter indicating that he saw Plaintiff for his second postoperative follow-up since his cervical fusion and first follow-up since his left carpal tunnel release. Tr. at 1007.  He indicated that Plaintiff reported no problems with the carpal tunnel release.  *Id*.  However, Plaintiff reported that he sustained a significant fall from standing on a chair or short ladder where his head ended up going through a

wall and he had neck pain and a grinding noise in his neck.  *Id.*  Imaging showed no complication with the neck hardware but there was mild reversal of the cervical spine curvature which was stable.  *Id.*  Examination showed that his arm strength was good.  *Id.*  He wanted to see Plaintiff back in six months and encouraged Plaintiff to wear his soft cervical collar.  *Id*. at 1008.

On November 20, 2013, Dr. Ogden wrote a letter to Dr. Figg concerning Plaintiff after Plaintiff indicated that he went to the emergency room complaining of popping his neck and continued neck pain.  Tr. at 1066.  Plaintiff had reported that the injections had helped him but the last cervical fusion did not as he still had significant neck pain and arm numbness.  *Id*.  Dr. Ogden recommended a bilateral upper extremity EMG/nerve conduction study.  *Id*. at 1067.

A November 21, 2013 EMG/nerve conduction study showed a possible C7 radiculopathy on the right and possible C5 radiculopathy on the left upper extremity.  Tr. at 1070.

On March 19, 2014, Dr. Ogden wrote Dr. Figg a letter indicating that he saw Plaintiff for follow-up and to discuss his most recent EMG/nerve conduction study results.  Tr. at 1283.  He recommended a cervical MRI to look at the C4-C5 and C6-C7 and thoracic x-rays as Plaintiff was complaining of pain between his shoulder blades.  *Id*. at 1284.

April 16, 2014 thoracic x-rays showed a normal result.  Tr. at 1286.  The cervical MRI showed no evidence of central spinal canal or foraminal stenosis and no disc herniation, but reversal of the normal cervical lordosis.  *Id*. at 1287.

On May 20, 2014, Plaintiff presented to Dr. Iannoti, an orthopedist, for evaluation of his bilateral scapular pain when using his arms to reach, lift, push or pull.  Tr. at 1316.  Examination revealed significant neck stiffness and mild discomfort to deep palpation around the periscapular musculature.  *Id*.  Dr. Iannoti's clinical impression was that Plaintiff had scapular pain due to a scapular fracture and nonunion.  *Id*. at 1317.  However, he needed to review the 3-D scapular imaging for both of Plaintiff's shoulders to better determine if a malunion existed.  *Id.*  X-rays showed postsurgical changes of the prior rotator cuff repair, focal calcification at the greater tuberosity on the right related to calcific tendinitis, and an anatomic deformity of the scapula bilaterally.  *Id*. at 1325.

On September 3, 2014, Dr. Ogden wrote a letter to Dr. Figg.  Tr. at 1645.  He indicated that upon a follow-up examination, Plaintiff described his symptoms and stated that he was trying to be as active as possible but minimal activity was causing chronic pain.  *Id.*  Dr. Ogden found that Plaintiff has normal arm strength and he noted Plaintiff's status post left carpal tunnel release on July 6, 2013, status post C4-C7 posterior cervical fixation and fusion with bilateral foraminotomies at each level on May 10, 2013, status post left ulnar nerve release on January 18, 2013 with resolved postoperative infection, and status post C5-C6 anterior cervical discectomy, fixation and fusion.  *Id.* at 1645-1646.  Dr. Ogden concluded:

> I do not think there is an easy solution to his issue.  He seems quite frustrated and seeks disability and given his multiple attempts at surgeries to alleviate his pain and multiple failures, and his new diagnosis of fibromyalgia, I doubt that this gentleman will be able to work 40 hours a week any time soon.

*Id.* at 1646.

## C. DR. FIGG'S MEDICAL REPORTS AND RECORDS

Dr. Figg performed the medial branch blocks, epidural steroid injections, and radiofrequency ablation ordered by Dr. Ogden beginning in 2012.  Tr. at 845-849, 851-869.  Dr. Figg gave Plaintiff a steroid injection at C6-C7 on March 30, 2012.  Tr. at 868-869.  He gave Plaintiff a second injection at C6-C7 on April 13, 2012.  *Id.* at 866.  After the second epidural steroid injection on April 13, 2012, Dr. Figg's chart included his examination notes of Plaintiff. *Id.* at 862-863.  The notes indicated that Plaintiff reported suffering from headaches, neck pain and low back since the go-cart accident and Plaintiff had undergone numerous orthopedic and muscle procedures, including a recent radial nerve decompression on the right side.  *Id.* at 862. Plaintiff described his pain as constant and aching in his neck, shoulder, low back and arm.  *Id.*  He tried a TENS unit and physical therapy, but he had no relief.  *Id.*  Dr. Figg's physical examination showed normal strength, sensation and reflexes, except for radial distribution numbness in the right forearm and hand.  *Id.*  He also noted mildly diminished range of motion in the neck.  *Id.*  He changed Plaintiff's medication, ordered an x-ray of the lumbar spine, and scheduled the third epidural steroid injection.  *Id.* at 864.

On December 20, 2012, Dr. Figg conducted an EMG/nerve conduction study on the right and diagnosed Plaintiff with acute, right C5-C6 radiculopathy. Tr. at 877. A left EMG/nerve conduction study showed left C5 and/or C6 radiculopathy, left ulnar neuropathy at the elbow consistent with left cubital tunnel syndrome, and mild left carpal tunnel syndrome. Tr. at 877-879.

On January 4, 2013, Dr. Figg performed an epidural steroid injection at C6-C7. Tr. at 888.

On April 18, 2013, Plaintiff followed up with Dr. Figg. Tr. at 957. Plaintiff complained of right shoulder and neck pain and examination showed good strength, but paraspinal muscular tenderness particularly in the lower right side of the neck and pain with abduction of right shoulder. *Id.* Dr. Figg noted that Plaintiff was scheduled for cervical fusion "redo" in early May. *Id.* He refilled Plaintiff's medications. *Id.* at 958.

On August 19, 2013, Dr. Figg examined Plaintiff and indicated that Plaintiff had undergone a posterior cervical fusion and a left carpal tunnel release over the summer, but he fell and may have been set back a bit in his recovery. Tr. at 1617. Dr. Figg noted that the x-rays showed no abnormalities, but Plaintiff continued to struggle with pain, even though he used a Fentanyl patch, Percocet, and tried physical therapy, ultrasound, TENS units and heat and cold. *Id.* Dr. Figg believed that Plaintiff was progressing, but he noted that Plaintiff was still struggling to lift his head to a normal position and he tended to keep his chin tucked at all times because of pain. *Id.*

On October 15, 2013, Dr. Figg administered five trigger point injections. Tr. at 1613. Physical examination showed full upper extremity strength, but Plaintiff had markedly abnormal posture, paraspinal muscular tenderness in the cervical spine and into the trapezius and splenius captitis. *Id.*

On November 4, 2013, Dr. Figg administered eight trigger point injections after Plaintiff reported that he had undergone a posterior cervical fusion and a left carpal tunnel release over the summer, but he fell and was in severe persistent pain even though x-rays showed no abnormalities. Tr. at 1606. He was using a Fentanyl patch and Oxycodone, but he felt that their utility was decreasing even though it allowed him to function, but he believed that his pain was getting worse and wished to continue with trigger point injections. *Id.* Physical examination showed full strength in the upper and lower extremities, markedly abnormal posture as he had forward position

-9-

of his head and a very difficult time looking upward.  *Id*. at 1607.  Dr. Figg also observed that Plaintiff had pain in distinct tender points throughout his paraspinal musculature in the cervical spine into the trapezius and rhomboids.  *Id*.

On November 11, 2013, Dr. Figg administered five trigger point injections after examining Plaintiff.  Tr. at 1586-1587.  Dr. Figg noted that Plaintiff returned one week after his last injection as he had improvement but then had severe pain in paraspinal musculature of the neck on the left and down into the trapezius and wanted another injection.  *Id*. at 1586.  Physical examination showed significantly forward flexed head position, the inability of Plaintiff to straighten his neck, severe and significant muscle spasm in the paraspinal musculature on the left, of the thoracic spine and into the trapezius on the right.  *Id*. at 1587.  Dr. Figg added steroid to increase the longevity of the injections and gave him a new prescription for Percocet to be increased to four times daily. *Id.* at 1587-1588.

On November 21, 2013, Dr. Figg administered five trigger point injections after Plaintiff reported benefitting from the last injections.  Tr. at 1572.  Physical examination showed an abnormal neck posture, scooping in the deltoids bilaterally with muscle wasting in the intrinsic hand musculature, and two areas of tenderness in the trapezius and one in the paraspinal musculature to the left of the mid thoracic region.  *Id*. at 1573.

A November 21, 2013 EMG/nerve conduction study showed that Plaintiff had a possible C7 radiculopathy on the right and a possible C5 radiculopathy on the left.  Tr. at 1623.

On December 4, 2013, Dr. Figg administered trigger point injections after examining Plaintiff.  Tr. at 1595-1596.  He noted that Plaintiff continued to have severe shoulder pain, but Plaintiff believed that the trigger point injections helped and he wanted to get away from using Fentanyl because of its side effects.  *Id*. at 1594.  Physical examination showed muscular wasting in the deltoids with abnormal posture with forward sniff position of the head, severe muscle spasm in the trapezius paraspinal musculature in the left neck and distinct trigger point in the right suprascapular region.  *Id*. at 1595.  Dr. Figg also decreased the Fentanyl patch and refilled Plaintiff's Percocet and Fioricet.  *Id*.

-10-

On January 6, 2014, Dr. Figg administered seven trigger point injections after examining Plaintiff.  Tr. at 1590-1591.  Dr. Figg noted that Plaintiff reported that he saw an orthopedic specialist who suggested that he may be a candidate for scapular fusion and he was going to submit his case to the Cleveland Clinic as very few surgeons performed such a procedure.  *Id*. at 1589. Dr. Figg also indicated that Plaintiff had muscular wasting in the deltoids, abnormal posture *with* a forward snit position of the head, and severe muscle spasms in the trapezius, paraspinal musculature and rhomboids.  *Id.* at 1590.  Dr. Figg administered the trigger point injections, continued Plaintiff's Fentanyl patch, gave him a prescription of Oxycodone up to four times per day, and prescribed Baclofen.  *Id*.

On February 6, 2014, Dr. Figg administered ten trigger point injections after examining Plaintiff.  Tr. at 1582-1583.  Dr. Figg noted that Plaintiff continued to complain of pain even though he was on high-dose opioids, muscle relaxants and Gabapentin.  *Id*. at 1582.  Physical examination showed that Plaintiff had very poor posture, atrophy in his deltoids, a forward flexed neck position and limited range of motion due to pain and spasm.  *Id*. at 1582.  Dr. Figg also indicated that Plaintiff had distinct tender points along the paraspinals in the cervical spine into the rhomboid and trapezius.  *Id*. at 1583.  He asked Plaintiff to cut back on lifting and any strenuous activity.  *Id*.  He prescribed Neurontin and refilled Plaintiff's Fentanyl patch.  *Id.*

On February 20, 2014, Dr. Figg administered eight trigger point injections after examining Plaintiff.  Tr. at 1577-1578.  Dr. Figg noted that Plaintiff was seeing him relatively often because he had such severe myofascial pain and the trigger point injections were helping without the side effects of the strong pain medications that he was taking.  *Id*. at 1577.  Physical examination showed significantly forward flexed position of the neck with the inability of Plaintiff to extend very much.  *Id*. at 1577-1578.  Dr. Figg also indicated that Plaintiff had distinct tender points and atrophy in the upper extremities in the deltoid and intrinsic hand musculature.  *Id*. at 1578.

On March 10, 2014, Dr. Figg examined Plaintiff and gave him ten trigger point injections. Tr. at 1558.  He noted that Plaintiff had significant pain that was difficult to control and he was on high doses of narcotics.  *Id*.  Dr. Figg indicated that while Plaintiff wanted to be off medications and return to work, "[g]iven the amount of abnormality in his anatomy at this point I am less than

optimistic that that is going to happen." *Id*. Dr. Figg stated that he was trying to give Plaintiff some relief with the injections which significantly helped Plaintiff each time. *Id.* Physical examination showed that Plaintiff had a significantly forward-flexed position in his neck, slightly better range of motion since the last visit, and distinct tender points and trigger points in the paraspinal musculature of the cervical spine in to the trapezius and deltoid, more on the right than the left. *Id.* at 1558-1559. Dr. Figg administered the injections and gave Plaintiff a prescription for massage therapy. *Id.* at 1559.

On March 24, 2014, Dr. Figg examined Plaintiff and administered six trigger point injections. Tr. at 1569. He noted that Plaintiff reported benefit with the injections and with moving the Fentanyl patch that he had been prescribed. *Id*.

On April 21, 2014, Dr. Figg examined Plaintiff and administered trigger point injections. Tr. at 1563. He noted that Plaintiff had a good outcome from his recent posterior fusion, but he was having a lot of myofascial pain and residual neuropathic pain, although the pain was improving with the addition of Neurontin but it made him very sleepy. *Id*. He indicated that Plaintiff was trying to have a peripheral nerve surgery scheduled. *Id*. Plaintiff also reported tingling and burning in the upper extremities and irritability secondary to the pain. *Id*. Dr. Figg noted that Plaintiff held his head in a forward-flexed position and he had a limited range of motion in his neck. *Id*. at 1564. Dr. Figg also noted that Plaintiff's upper extremity strength was intact, but he had deltoid atrophy and five areas of distinct tenderness and trigger points throughout the splenius capitis into the trapezius. *Id.* Dr. Figg administered five trigger point injections and began weaning Plaintiff off of his medications as Plaintiff requested. *Id*.

On May 8, 2014, Dr. Figg administered three trigger point injections into Plaintiff's right paraspinal musculature and into his trapezius, one injection into his rhomboid on the right, and three injections on the left. Tr. at 1557. He noted that Plaintiff had persistent pain status post cervical fusion and was in the process of scheduling another surgery. *Id.* Dr. Figg indicated that Plaintiff was in the process of weaning his opioids as the injections were helping his pain. *Id.*

A May 29, 2014 EMG/nerve conduction study showed that Plaintiff had evidence of chronic neuropathic changes in the deltoid possibly related to a C5-C6 radiculopathy. Tr. at 1628.

On February 1, 2015, Dr. Figg completed a physical residual functional capacity ("RFC") assessment opining that Plaintiff could frequently and occasionally lift less than 10 pounds and stand/walk less than 2 hours per 8-hour workday; he required a sit/stand option to relieve pain or discomfort, and he had limited ability in his upper extremities to push and pull due to atrophy and weakness in his shoulders and neck. Tr. at 1783. Dr. Figg explained that Plaintiff had very limited range of motion in his neck due to status post fusion, and he had atrophy and weakness in the upper extremities, along with myofascial pain and spasm which worsened with position and activity. *Id.* Dr. Figg further opined that Plaintiff could never climb ramps, stairs, ladders or scaffolds, he could never crawl, and he could only occasionally balance, stoop, kneel and crouch due to his inability to lift his head adequately to allow him to perform such postural activities. *Id.* at 1784. Dr. Figg also opined that Plaintiff was limited in reaching in all directions, including overhead, and limited in handling, fingering and feeling due to nerve damage from his neck surgery and his severe shoulder damage and pain with limited range of motion. *Id.* at 1785.

### D.  TESTIMONIAL EVIDENCE

At the ALJ hearing, Plaintiff testified that he was 40 years old and lived in a one story house with his girlfriend and two of his three minor children, with the third minor child living with him in the summer. Tr. at 39. He indicated that he last worked in 2010 or 2011 attempting small roofing jobs, but his rotator cuffs kept tearing due to the injuries he suffered in the go-cart accident. *Id.* He reported that he underwent 10-15 surgeries that were not even in the record following the go-cart accident and he tried to work through the pain but could not do so. *Id.* at 40. He stated that his girlfriend even has to shave his neck because he is in so much pain when he moves it. *Id.* at 42-43. He indicated that his neck crunches when he moves it and his surgeon told him that he had to go to an infectious disease doctor because the scabs from his last neck fusion in 2013 still had not completely healed. *Id.* at 43.

Plaintiff told the ALJ that even driving 5-6 miles to pick his son up from school or to go to the grocery store requires him to take a pain pill before he leaves and to come home afterward and lay down for the rest of the day. Tr. at 44. He explained that walking into a store wears him out because he has to hold his neck up in a certain way so he does not look stupid and it causes him

so much pain that by the time he leaves, he is in tears. *Id*. at 45. He said that driving is one of the most painful things. *Id*. He also testified that because of the heavy narcotics that he has to take, he cannot operate machinery or perform his roofing jobs. *Id*. at 47.

Plaintiff informed the ALJ that his most severe problems were his neck and shoulders. Tr. at 48. He explained that he had gone to Dr. Ianotti, a renowned orthopedic surgeon who has performed a scapular fusion which is a procedure done under ten times throughout the entire world, and he informed Plaintiff that while his scapula did not heal correctly, he could not perform the scapular fusion on him because he would have very limited motion and would not be able to perform basic functions like washing his hair. *Id*. at 49. He described errors that Dr. Ianotti said other physicians who performed surgery on Plaintiff made which caused him more pain and problems. *Id*. at 49-50. Plaintiff reported that since 2010, he underwent 17-19 surgeries to alleviate the pain that he felt, but he still felt the pain. *Id*. at 50. He described getting up in the morning and stated that before his feet hit the carpet, he has to take a pain pill. *Id*. at 51. He testified that he lays down all day long and they had to stop giving him Neurontin as he was up to 3,600 mg to help his nerve pain and it did not even help. *Id*. at 52. He described a good day as being able to function two hours out of a day. *Id*. at 53.

Plaintiff testified that he can dress himself and can bathe and shower, but not without pain. Tr. at 56. He performs no household chores, does not drink alcohol or take recreational drugs and the side effects from his medications are enough for him and cause too many side effects, such as excessive sleepiness and memory loss. *Id*. at 56-57. He explained that his girlfriend does a lot for his children and attends their events. *Id*. at 57.

The ALJ then questioned the VE. Tr. at 60. The ALJ asked the VE to assume a hypothetical person with Plaintiff's experience and education that could: lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand/walk up to 6 hours of an 8-hour workday; occasionally push and pull with the upper extremities and occasionally reach in all directions and handle objects frequently bilaterally; frequently climb ramps and stairs; balance; occasionally stoop, kneel, and crouch; never crawl or climb ladders, ropes, or scaffolds; avoid concentrated exposure to vibration, fumes, dust, gas, odors and poor ventilation; and avoid all exposure to

-14-

hazards such as unprotected machines and heights.  *Id*. at 61.  When the ALJ asked whether this hypothetical individual could perform Plaintiff's past relevant work as a roofer, the VE responded that he could not, but he could perform the jobs of surveillance system monitor and information clerk, two jobs that exist in significant numbers in the national economy.  *Id*. at 61-62.  The ALJ then asked the VE to assume a hypothetical person with Plaintiff's experience and education and all of the restrictions of his first hypothetical person except that the person could only carry less than 10 pounds occasionally; could stand/walk up to 2 hours of an 8-hour workday; would need a sit/stand option; could never climb or crawl; but he could occasionally balance, stoop, kneel, and crouch.  *Id.* at 62.  When the ALJ asked whether this hypothetical individual could perform Plaintiff's past relevant work or any work, the VE responded that he could still perform the jobs of surveillance system monitor and information clerk.  *Id*. at 62.  The ALJ then asked the VE whether a hypothetical person could perform Plaintiff's past work or any work with all of the restrictions as the first two hypothetical individuals that was also not able to consistently maintain an 8-hour workday or 40-hour workweek due to pain, medication side effects and other symptoms.  *Id.* at 62.  The VE responded that such an individual could not perform any work.  *Id.*

### III.    RELEVANT PORTIONS OF THE ALJ'S DECISION

In his decision, the ALJ first found that Plaintiff worked as a roofer after his alleged disability onset date, but had unsuccessful work attempts and therefore did not engage in substantial gainful activity since January 12, 2010, the alleged onset date.  Tr. at 16.  He then determined that Plaintiff suffered from the following severe impairments: degenerative disc disease ("DDD") of the cervical and lumbar spine status-post cervical fusion, degenerative joint disease ("DJD") of the bilateral shoulders status-post rotator cuff surgery, asthma, carpal tunnel syndrome in the left arm and radial tunnel syndrome in the right arm status-post decompression, osteoarthritis of the bilateral knees and shoulders, and obesity.  *Id*. at 16-17.

Continuing, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the Listings.  Tr. at 18.  He specifically considered Listings 1.02, 1.04 and 3.03, as well as  Plaintiff's obesity in conjunction with the Listings.  *Id*. at 18-19.  The ALJ determined that Plaintiff had the

-15-

RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), except that he would have to alternate between sitting and standing at his discretion, he could occasionally push, pull and reach in all directions with the bilateral upper extremities, he could occasionally balance, stoop, kneel, crouch and handle bilaterally, but he could not climb or crawl, and he had to avoid concentrated exposure to vibration, fumes, dust, odors, gases and poor ventilation, and avoid all exposure to hazards such as unrestricted heights and dangerous machinery.  *Id.* at 19.

Next, the ALJ found that with the RFC that he determined and the testimony of the VE, Plaintiff could not perform his past relevant work as a roofer, but he could perform the jobs of surveillance system monitor and information clerk.  Tr. at 23.  The ALJ concluded that Plaintiff was not under a disability for social security purposes and was not entitled to SSI.  *Id.* at 24.

**IV.**   **STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits.  These steps are:

1.   An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.   An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.   If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.   If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.   If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

**V.     STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted)).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance."  *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007).  Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled.  The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001).  However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (internal citations omitted).

**IV.     LAW AND ANALYSIS**

**A.     LISTINGS 1.02 AND 1.04**

Plaintiff first challenges the ALJ's determination that his impairments did not meet or medically equal Listing 1.02 and/or Listing 1.04.  ECF Dkt. #11 at 3-4.  Plaintiff submits that his

impairments do meet or medically equal these Listings and the ALJ erred in his treatment of the opinions of Dr. Ogden, Dr. Figg and his physical therapist Mr. Stahr, whose opinions support a finding that his conditions meet or medically equaled Listings 1.02 and/or 1.04 and support a very limited RFC that results in no jobs being available for him to perform.

Listing 1.02 provides in relevant part:

1.02  Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

OR

B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

Listing 1.02.  Listing 1.04 provides that:

1.04 Disorders of the spine  (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Listing 1.04.

-18-

The Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 describes impairments for each of the major body parts that are deemed of sufficient severity to prevent a person from performing gainful activity. 20 C.F.R. § 416.920. In the third step of the analysis to determine a claimant's entitlement to social security benefits, it is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment. *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987). In order to meet a listed impairment, the claimant must show that his impairments meet all of the requirements for a listed impairment. *Hale v. Sec'y,* 816 F.2d 1078, 1083 (6th Cir. 1987). An impairment that meets only some of the medical criteria and not all does not qualify, despite its severity. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

An impairment or combination of impairments is considered medically equivalent to a listed impairment "* * *if the symptoms, signs and laboratory findings as shown in medical evidence are at least equal in severity and duration to the listed impairments." *Land v. Sec'y of Health and Human Servs.*, 814 F.2d 241, 245 (6th Cir.1986) (per curiam). Generally, an ALJ should have a medical expert testify and give his opinion before determining medical equivalence. 20 C.F.R. § 416.926(b). In order to show that an unlisted impairment or combination of impairments is medically equivalent to a listed impairment, the claimant "must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan*, 493 U.S. at 531.

An ALJ does not have a "heightened articulation standard" in considering the listing of impairments. *Bledsoe v. Barnhart*, 165 Fed. App'x 408, 411 (6th Cir.2006). Rather, the Court considers whether substantial evidence supports the ALJ's findings. *Id.* However, an ALJ's decision must contain "sufficient analysis to allow for meaningful judicial review of the listing impairment decision." *Reynolds*, 424 Fed. App'x at 415–416. The Court may look to the ALJ's decision in its entirety in order to justify the ALJ's Step 3 analysis. *Bledsoe*, 165 Fed. App'x at 411.

The undersigned notes that Plaintiff does not sufficiently meet his burden of establishing that his impairments meet or medically equal Listings 1.02 or 1.04. He focuses on the ALJ's findings at Step Three and states that the ALJ disregarded evidence of muscle spasms, numbness

-19-

and tingling, and completely ignored Dr. Figg's medical report showing Plaintiff's very limited range of motion and limited abilities to reach, handle, finger and feel. ECF Dkt. #11.at 4. Plaintiff cites only to Dr. Figg's medical report and a listing of all of Plaintiff's prior surgeries identified in the record. *Id.* at 3-4.

The undersigned recommends that the Court find that Plaintiff fails to establish that his impairments meet or equal the last part of Listing 1.02 itself which requires "findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)." Listing 1.02. He also fails to establish the inability to ambulate or to perform fine and gross movements as found by the ALJ. Listing 1.02B.

Moreover, even if Plaintiff did meet his burden of establishing that he meets or equals Listings 1.02 and 1.04, and keeping in mind that the standard of review is whether substantial evidence supports the ALJ's determination and that determination cannot be overturned even if substantial evidence exists to the contrary, the undersigned recommends that the Court find that substantial evidence supports the ALJ's Step Three findings. Even though some of the findings that the ALJ made were inaccurate and he should have provided a more thorough analysis, his Step Three analysis, combined with the rest of his decision, provide more than a scintilla of evidence to find that Plaintiff's impairments do not meet or medically equal Listings 1.02 or 1.04.

Plaintiff asserts that his impairments satisfy Listings 1.02 and 1.04 and he cites instances in the record showing that he had limited range of motion, muscle spasms, and numbness and tingling. ECF Dkt. #11 at 4, citing Tr. at 935, 1066, 1069. The ALJ found that "the record only documents complaints of intermittent numbness and tingling in the upper extremities without any indication of an inability to perform fine and gross movements. (19F/5; 52F/1). It is further noted that the claimant reported that he could write using his right hand, indicating an ability to perform fine movements." Tr. at 19. While Plaintiff points out instances in the record showing that he had numbness and tingling in his upper extremities, the ALJ cited to instances in the record supporting his finding that Plaintiff had only intermittent numbness and tingling in his upper extremities. Tr. at 19, citing Tr. at 902, 1562. Plaintiff also complains that the ALJ disregarded evidence of muscle spasms and numbness and tingling. ECF Dkt. #11 at 4. However, the ALJ mentions these very

-20-

symptoms in his decision, stating that "[w]hile there is some evidence of muscle spasm, the records show that it is primarily located in the neck, and the claimant's physician notes improving range of motion with treatment." Tr. at 19. The ALJ also referenced records indicating that Plaintiff had significant numbness and pain in both hands. *Id*. at 17.

The undersigned questions the ALJ's use of the record indicating that Plaintiff could write with his right hand as evidence of his ability to perform fine movements. Tr. at 19. The ALJ relied upon a report by Plaintiff at his EMG/nerve conduction study in which Plaintiff reported that he can write with his right hand. *Id*., citing Tr. at 1622. However, the ALJ does not cite to the rest of Plaintiff's statement at that study where he indicated that when he writes with his right hand, his hand cramps and he experiences significant numbness in both hands in the 4th-5th digits. *Id*.

Regardless, the ALJ cited to instances in the record that support a finding that Plaintiff can perform fine and gross movements, such as when Plaintiff reported that he could play basketball, and he was attending college full-time. Tr. at 19, citing Tr. at 884, 1161. The ALJ also cited to instances in which Plaintiff had full strength and range of motion in his arms, full flexion and extension of the wrists and a normal gait. Tr. at 19, citing Tr. at 1178, 1271, 1556. The undersigned therefore recommends that the Court find that substantial evidence supports the ALJ's finding that Plaintiff's impairments did not meet or medically equal Listing 1.02.

As to Listing 1.04, the ALJ found that Plaintiff failed to meet the severity required under this Listing as well because no there was no evidence of nerve root compression, spinal arachnoiditis or spinal stenosis resulting in an inability to ambulate. Tr. at 19. He cited to cervical and lumbar imaging records which showed no nerve root compression, spinal arachnoiditis, or spinal stenosis and he cited to other records showing a normal gait on physical examination. *Id.,* citing Tr. at 832, 855, 1779. The undersigned recommends that the Court find that substantial evidence supports this determination.

Plaintiff also complains that the ALJ completely ignored Dr. Figg's medical report finding that Plaintiff had very limited motion and abilities to reach, handle, finger and feel, which indicates difficulty performing fine and gross movements. ECF Dkt. #11 at 4. In his decision, the ALJ did give great weight to Dr. Figg's opinion. Tr. at 21. However, neither Dr. Figg's restrictive

limitations nor the rest of his medical report establish that Plaintiff's impairments meet or equal Listings 1.02 or 1.04.  Dr. Figg opined that Plaintiff can frequently and occasionally lift and/or carry less than 10 pounds, he can stand/walk less than 2 hours per 8-hour workday, he requires a sit/stand opinion, he was limited in reaching, pushing, pulling and fingering, and he had postural limitations.  Tr. at 1783-1784.  However, Dr. Figg does not cite to "findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)" as required by Listing 1.02 or an inability to ambulate effectively or to perform fine and gross movements as defined in 1.00B2b and 1.00B2c, respectively.  Nor does Dr. Figg's report establish evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis as required by Listing 1.04.

In summary, while evidence exists in the record indicating a contrary result, the ALJ cited to evidence in the record that constitutes substantial evidence to support his findings that Plaintiff's impairments did not meet or medically equal Listings 1.02 or 1.04.  The undersigned therefore recommends that the Court find that substantial evidence supports the ALJ's determination that Plaintiff's impairments do not meet or medically equal Listings 1.02 or 1.04.

### B.  TREATING PHYSICIANS' AND PHYSICAL THERAPIST'S REPORTS

Plaintiff also challenges the ALJ's treatment of the opinions of his treating physicians, Drs. Ogden and Figg, and his physical therapist, Mr. Stahr.  The undersigned recommends that the Court find merit to Plaintiff's assertions concerning the opinions of Drs. Ogden and Figg, but not as to that of Mr. Stahr.

On September 3, 2014, Dr. Ogden wrote a letter to Dr. Figg concerning Plaintiff after he examined Plaintiff at a follow-up appointment.  Tr. at 1645.  Dr. Ogden indicated that Plaintiff described a number of symptoms at the visit and Plaintiff indicated that he was trying to be as active as possible but minimal activity was causing chronic pain.  *Id.*  Dr. Ogden noted that Plaintiff had normal arm strength and the incision on Plaintiff's neck looked good.  *Id.*  He noted Plaintiff's status post left carpal tunnel release on July 6, 2013, his status post C4-C7 posterior cervical fixation and fusion with bilateral foraminotomies at each level on May 10, 2013, his status post left ulnar nerve release on January 18, 2013 with resolved postoperative infection, and his status post C5-C6 anterior cervical discectomy, fixation and fusion.  *Id*. at 1645-1646.  Dr. Ogden concluded:

> I do not think there is an easy solution to his issue.  He seems quite frustrated and seeks disability and given his multiple attempts at surgeries to alleviate his pain and multiple failures, and his new diagnosis of fibromyalgia, I doubt that this gentleman will be able to work 40 hours a week any time soon.

*Id*. at 1646.

Plaintiff asserts that the ALJ failed to provide sufficient information in attributing little weight to the report of Dr. Ogden, who stated that "I doubt that this gentleman will be able to work 40 hours a week any time soon." ECF Dkt. #11 at 6, quoting Tr. at 1646.  Plaintiff complains that the ALJ should have provided more information since Dr. Ogden is a treating physician who examined Plaintiff and reviewed all of his cervical imaging, such as CT scans and MRIs.  *Id*. at 7.

The ALJ acknowledged Dr. Ogden's September 3, 2014 letter to Dr. Figg and specifically referenced Dr. Ogden's opinion in that letter that Plaintiff would be unable to work 40 hours per week.  Tr. at 21.  However, the ALJ attributed little weight to this opinion, explaining that this is an issue reserved to the Commissioner and it was inconsistent with his examination of Plaintiff as his notes showed that Plaintiff had normal arm and leg strength despite Plaintiff's complaints of pain.  *Id*. at 21-22, citing Tr. at 959, 1000, 1280, 1645.

On February 1, 2015, Dr. Figg completed a physical RFC assessment opining that Plaintiff could frequently and occasionally lift less than 10 pounds, stand/walk less than 2 hours per 8-hour workday, he needed a sit/stand option to relieve pain or discomfort, he had limited pulling and pushing with his upper extremities due to atrophy and weakness in his shoulders and neck.  Tr. at 1783.  He explained that Plaintiff had very limited range of motion in his neck due to status post fusion, and has atrophy and weakness in the upper extremities, along with myofascial pain and spasm which worsen with position and activity.  *Id*.  Dr. Figg further opined that Plaintiff could never climb ramps, stairs, ladders or scaffolds, and never crawl, and he could only occasionally balance, stoop, kneel and crouch due to his inability to lift his head adequately to allow him to perform such postural activities.  *Id*. at 1784.  The doctor further opined that Plaintiff was limited in reaching in all directions, including overhead, handling, fingering and feeling due to nerve damage from his neck surgery and his severe shoulder damage and pain with limited range of motion.  *Id.* at 1785.

The ALJ reviewed Dr. Figg's opinion in his decision, adopted it, and afforded it great weight because Dr. Figg was a long-time treating physician who specialized in neurology and pain management.  Tr. at 21.  He found that Dr. Figg's opinion was consistent with his treatment

records showing decreased exertional and postural abilities and limited pushing and pulling.  *Id*. The ALJ found that Dr. Figg's opinion was consistent with the ability of Plaintiff to perform the equivalent of sedentary work.  *Id*.

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so.  SSR 96-2p.  The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*  This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore "'be bewildered when told by an administrative bureaucracy that ]he is not, unless some reason for the agency's decision is supplied.'" *Wilson,* 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999)).  Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Id.*  If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight afforded to the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243 (citing *Wilson*, 378 F.3d at 544).

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. Apr.28, 2010).  The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th Cir. March 15, 2011) (quoting *Rogers*, 486 F.3d at 243 ).  However, an ALJ need not discuss every piece of evidence in the administrative record so long as he considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence. *See* 20 C.F.R. § 404.1545(a)(2); *see also Thacker v. Comm'r of Soc. Sec.*, 99 Fed.Appx. 661, 665 (6th Cir.2004). Substantial evidence can be "less than a preponderance," but must be

adequate for a reasonable mind to accept the ALJ's conclusion. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir.2010) (citation omitted).

In addressing the opinions of Plaintiff's long-time treating neurosurgeon, Dr. Ogden, and his physician who specializes in neurology and pain management, Dr. Figg, the ALJ failed to explain why he afford their opinions less than controlling weight.  Instead, he proceeded right to attributing little weight to Dr. Ogden's opinion weight and great weight to Dr. Figg's opinion.  Tr. at 21-22.  In doing so, the ALJ neglected to identify the reasons for affording the opinions less than controlling weight, especially that of Dr. Figg, as it appears that the ALJ wholly accepted the pertinent parts of his opinion even though Dr. Figg opined that Plaintiff could frequently or occasionally lift or carry less than ten pounds and could stand/walk less than two hours per workday.  *Id.* at 21, 1783.  Accordingly, the undersigned recommends that the Court remand the instant case so that the ALJ can properly apply the treating physician rule to the opinions of Dr. Ogden and Dr. Figg.

Defendant attempts to argue that the ALJ's violation of the treating physician rule as to Dr. Figg's opinion is harmless because the jobs identified by the VE at the hearing still qualify because it accommodated Dr. Figg's lifting and carrying requirement. The Social Security Regulations define "sedentary work" as involving "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 1567(a); 20 C.F.R. § 927(a).  At the ALJ hearing, the VE testified that the two jobs that he identified as available for the hypothetical individual described by the ALJ who could perform limited sedentary work were still available for a person who was limited in lifting less than ten pounds occasionally, despite the Dictionary of Occupational Titles finding otherwise, because the two jobs did not require much lifting at all in his experience. Tr. at 63.  Thus, as Defendant argues, the ALJ resolved the issue of lifting or carrying less than ten pounds with the VE at the hearing.

However, the issue of standing or walking less than two hours per workday was not resolved.  Dr. Figg had opined that Plaintiff could stand/walk less than 2 hours per 8-hour workday. *Id.* at 1783.  The ALJ gave great weight to this portion of Dr. Figg's opinion. *Id.* at 21.

The definition of sedentary work indicates that "a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a); 20 C.F.R. §927(a). The ALJ included this limitation in his hypothetical individual presented to the VE and the VE testified that the two jobs still remained with this limitation and the lifting and carrying limitation. Tr. at 61-62.  However, when testifying that he had departed from the Dictionary of Occupational Titles definitions for the two jobs, the VE specifically stated that he had done so only with regard to the lifting and carrying limitation.  *Id*. at 63.   The Dictionary of Occupational Titles lists the level of the two jobs identified by the VE, surveillance system monitor and unskilled information clerk, as sedentary.  *See* DOT 379.367-010 and 237.367-046.  The definition of sedentary requires a certain amount of walking and standing and Dr. Figg specifically limited Plaintiff's ability to walk and stand.  *Id*. at 1783. Without further explanation by the ALJ and the VE to specifically include Dr. Figg's standing and walking limitations, substantial evidence does not support the ALJ's Step Five findings.  Thus, the ALJ's violation of the treating physician rule is not harmless.

As to the opinion of Mr. Stahr, Plaintiff's physical therapist, Plaintiff asserts that the ALJ should have given the opinion more than the little weight that he attributed it.  ECF Dkt. #11 at 7. Plaintiff contends that Mr. Stahr  opined that Plaintiff's driving and traveling was limited and he was unable to perform any lifting.  *Id*., citing Tr. at 1459-1555.  Although not mentioned by the ALJ, the undersigned notes that a review of the evaluation and physical therapy progress notes shows that these limitations are located under the "Subjective Examination" portion of the evaluation, which relies upon Plaintiff's narration and answers to questionnaires.  *Id*. at 1475, 1478, 1480, 1482, 1484, 1486, 1488, 1490, 1492, 1494, 1496,1499, 1501, 1504, 1508, 1511, 1514, 1517, 1520, 1523, 1526, 1529, 1532, 1536, 1538, 1540, 1542, 1544, 1546, 1548, 1550, 1553. The "Subjective Examination" portions of these evaluations and notes state that Plaintiff's driving/traveling is either "(Bilateral - Limited by Pain &/or Guarding)"or limited by ("cervical spasm and impaired ROM") and he is also "unable to perform" lifting.  *Id.*  The Objective Examinations are then listed following the Subjective Examination sections, followed by  the Therapist's Observations and ranges of motion, Recommended Treatments and Goals.  *Id.*  Thus, it does not appear that the parts of the evaluation and progress notes cited by Plaintiff actually document Mr. Stahr's opinions as they are Plaintiff's reports of his symptoms and limitations.

In addition, and also not mentioned by the ALJ, a physical therapist is not an acceptable medical source. Thus, Mr. Stahr cannot render a medical opinion pursuant to 20 C.F.R. § 404.1527(a), although the ALJ can consider his opinions without the procedural protections of a treating source or acceptable medical source's opinions.

The ALJ did consider Mr. Stahr's progress notes and found that his opinion that Plaintiff was unable to work was an issue reserved for the Commissioner. Tr. at 22. He also pointed out that Mr. Stahr did not include in his treatment notes after June of 2013 that Plaintiff was unable to work, recent treatment records showed improvement in Plaintiff's range of motion and only some tingling in the upper extremities, and Plaintiff was weaning himself off of medications. *Id.*

The ALJ correctly found that the issue as to whether a claimant can work is one reserved to the ALJ. *See* 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Further, Mr. Stahr's progress notes do state that Plaintiff was "[u]nable to work secondary to pain" prior to June of 2013 and then this statement is not present after that date. Tr. at 1475, 1478, 1480, 1482, 1484, 1490, 1492, 1484, 1486, 1488, 1494, 1496, 1499, 1501, 1504, 1508, 1511, 1529, 1532, 1534, 1536, 1538, 1540, 1542, 1544, 1546, 1548, 1550, 1553. The undersigned recommends that the Court find that these findings, coupled with the facts that Mr. Stahr was not an acceptable source, the limitations on driving and lifting in the progress notes were not provided by Mr. Stahr, and the ALJ's citations to records showing that Plaintiff experienced improvement in his range of motion and only intermittent tingling in the upper extremities, constitutes substantial evidence to attribute only little weight to Mr. Stahr's opinions.

## VII.    RECOMMENDATION AND CONCLUSION

For the foregoing reasons, the undersigned recommends that the Court REVERSE the

ALJ's decision and REMAND the instant case so that the ALJ can properly apply the treating

physician rule to the opinions of Dr. Ogden and Dr. Figg.


DATE: December 20, 2016                          ____/s/George J. Limbert_____
                                                 GEORGE J. LIMBERT
                                                 UNITED STATES MAGISTRATE JUDGE


        ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of
Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to
file objections within the specified time WAIVES the right to appeal the Magistrate Judge's
recommendation. L.R. 72.3(b).